UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/12/19

NIURKA CORONA,

                    Plaintiff,                    17-cv-4438 (JGK)

        - against -                               MEMORANDUM OPINION
                                                  AND ORDER
CLARINS U.S.A., INC., and FELIPE
VACA,

                    Defendants.

JOHN G. KOELTL, District Judge:

    The plaintiff, Niurka Corona, brings this action against
her former employer, Clarins U.S.A., Inc. ("Clarins"), and a
former Clarins manager, Felipe Vaca (collectively, the
"defendants"). The plaintiff alleges that she was disabled by
parotid gland cancer, and that the defendants terminated her
employment as a sales associate because of her disability. The
plaintiff alleges violations of the Americans with Disabilities
Act ("ADA"), 42 U.S.C. § 12101 et seq., the New York State Human
Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New
York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-
101 et seq. Under each statute, the plaintiff alleges
(1) failure to accommodate her disability, (2) employment
discrimination, and (3) retaliation.

    The defendants move for summary judgment dismissing each of
the plaintiff's claims. The plaintiff opposes the motion, except

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 9·12·79

as it pertains to her failure to accommodate claims and ADA claims against the defendant Vaca.

## I.

The standard for granting summary judgment is well established. "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial," summary judgment should be granted against that party. Celotex, 477 U.S. at 322; Fed. R. Civ. P. 56(c)(1)(B) & 2010 Advisory Committee Note.

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 .(1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

District courts should "be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); see also Chambers, 43 F.3d at 40. However, "a plaintiff must provide more than conclusory allegations to resist a motion for summary

judgment, and show more than some metaphysical doubt as to the material facts." Gorzynski v. Jet Blue Airways, 596 F.3d 93, 101 (2d Cir. 2010) (citations omitted). The Supreme Court has instructed that courts are not to treat discrimination any "differently from other ultimate questions of fact." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (quotation marks omitted).

## II.

The following facts are undisputed unless otherwise indicated.

## A.

The plaintiff worked as a sales associate for Clarins at its fragrance counter located at Saks Fifth Avenue in New York City. (Defs.' 56.1 Stmt. ¶¶ 2-3.) Among other duties, the plaintiff was tasked with selling new fragrance products. (Id. ¶¶ 4-5.) The plaintiff's superiors included her immediate supervisor, Kareline Guzman, and Guzman's supervisor, defendant Felipe Vaca. (Id. ¶¶ 7, 10.)

The defendants contend that, from the outset of her employment beginning in March 2016, the plaintiff exhibited a pattern of disrespectful behavior that affected her job performance. (Id. ¶¶ 34-36.) The defendants also contend that Guzman regularly reported this behavior to Vaca. (Vaca Dep. at 51-54; Guzman Dep. at 63-65.)

4

The defendants offer several examples of the plaintiff's allegedly unprofessional behavior, including her excessive use of her cell phone at the sales counter, her inattentiveness to the sales counter, her resistance to performing job duties such as writing client letters, and her failure to address customers politely. (Vaca Dep. at 53-56, 66-67, 112, 241-46; Guzman Dep. at 86-87, 211-12; Brinkerhoff Dep. at 114-15, 135-36.)

The plaintiff denies any alleged deficiencies in her job performance. (Corona Decl. ¶¶ 4-8.) For example, the plaintiff maintains that she used her cell phone for business purposes and that she stopped doing so after Guzman informed her about a new company policy related to cell phone use. (Pl.'s 56.1 Stmt. ¶¶ 134-37.) She denies ever leaving the sales counter at an inappropriate time. (Corona Decl. ¶¶ 10-12.) She also denies any failure to perform duties such as writing client letters. (Id. ¶ 4.) Finally, she insists that she never disrespected her superiors or customers. (Id. ¶¶ 14, 18.)

It is undisputed that before the onset of the plaintiff's disability, a conflict between the plaintiff and her superiors occurred in June 2016. (Defs.' 56.1 Stmt. ¶ 62.) At that time, the plaintiff and Guzman got into a verbal argument about the plaintiff's client service duties. (Id. ¶¶ 62-64; Pl.'s 56.1 Stmt. ¶¶ 62-64.) Guzman claimed that the plaintiff refused to follow instructions in crafting an email to a client and that

she had "disrespected [Guzman] in ways that [Guzman had] never been disrespected before." (Guzman Dep. at 63.) Guzman sent an email detailing the incident to Vaca. (Metis Decl. Ex. H.) The plaintiff claims that the email is inaccurate, and that Guzman was at fault for the incident. (Corona Dep. at 147-48.)

**B.**

On July 30, 2016, the plaintiff fainted at work and was taken to the hospital. (Pl.'s 56.1 Stmt. ¶ 69.) She went on short-term medical leave, which Clarins approved. (Defs.' 56.1 Stmt. ¶¶ 71-72.) The plaintiff returned to work on September 21, 2016, before her illness was diagnosed. (Id. ¶ 78.) Upon her return, she provided two doctors' notes to her supervisors which stated some medical restrictions, including that her working hours should not exceed nine per day, that she should receive ample break time, and that any heavy lifting, pushing, pulling, bending down, or stair climbing should be limited. (Id. ¶¶ 76-77, 83-84.) The defendants provided all of the accommodations that the plaintiff requested. (Id. ¶¶ 104; Corona Dep. at 119-20.) Once accommodated, the plaintiff's medical restrictions did not prevent her from performing the essential functions of her job as a sales associate. (Defs.' 56.1 Stmt. ¶ 88.)

After her return to work, the focus on the plaintiff's performance shifted towards meeting certain sales goals. Vaca created monthly sales goals for each member of the sales

counter, including the plaintiff. (Id. ¶ 38; Pl.'s 56.1 Stmt. ¶ 42.) However, the parties dispute when the defendants first imposed these goals. The defendants claim that they imposed the goals beginning on "day one" of the plaintiff's employment in March 2016. (Defs.' 56.1 Stmt. ¶¶ 24, 39.) The plaintiff counters that the defendants imposed the goals beginning in October 2016, which was only after she returned from her medical leave. (Pl.'s 56.1 Stmt. ¶¶ 24, 39.)

On December 8, 2016, Vaca provided the plaintiff with two written warnings ("write-ups") for missing her October and November sales goals. (Defs.' 56.1 Stmt. ¶ 148.) These write-ups were part of Clarins's disciplinary process for employees. The informal disciplinary policy included several steps. (Id. ¶ 145.) First, a superior would verbally discuss any workplace problems with the employee. (Id. ¶ 146.) Second, a superior would issue a write-up to the employee. (Id.) The third step -- termination -- could be considered if the employee did not correct the problem within 30 days of receiving the write-up. (Id.) Vaca testified that an employee had to receive two successive write-ups before termination could be considered. (Vaca Dep. at 235.)

The plaintiff contends that the December 8, 2016 disciplinary action contravened Clarins's policy in two ways. The plaintiff alleges that the defendants bypassed the first

step of Clarins's disciplinary process because her supervisors never held an informal discussion with her before issuing the write-ups. (Corona Decl. ¶ 20.) She also alleges that it was abnormal for an employee to receive two successive write-ups in the same day, although the practice was not unheard of at Clarins. (Pl.' 56.1 Stmt. ¶ 149.)

The two write-ups addressed the plaintiff's sales metrics. The first write-up stated that, in October, the plaintiff sold $9,200.00 out of her goal of selling $36,000.00 worth of two Prada products named "Olfactories" and "Les Infusion." (Metis Decl. Ex. O.) Likewise, the second write-up stated that, in November, the plaintiff sold $11,800.00 out of her goal of selling $53,000.00 worth of the same two Prada products. (Id. Ex. P.) The November write-up also stated that the plaintiff registered 21 percent of her clients to a Saks client data capture system, falling short of a Saks store-wide goal of 75 percent registration. (Defs.' 56.1 Stmt. ¶¶ 153-54.) The plaintiff disputes the accuracy of this registration figure. (Id.; Pl.'s 56.1 Stmt. ¶¶ 132-33.) Both write-ups suggested corrective actions and warned that if the plaintiff's performance did not "significantly improve within thirty days, employment termination may be contemplated." (Metis Decl. Exs. O & P.)

The plaintiff refused to sign either write-up. (Defs.' 56.1 Stmt. ¶ 152.) The plaintiff alleges that she refused to sign in protest because she felt that the sales goals were impossible to achieve and that Vaca had implemented them to "set [her] up to fail." (Corona Decl. ¶ 25.) She also alleges that when Vaca issued the write-ups to her, he told her that she was a "good looking woman" who could use her attributes to increase her sales. (Id. ¶ 26.)

When Vaca issued the write-ups, Guzman was physically present and a Clarins human resources manager, Amanda Brinkerhoff, attended by phone. (Pl.'s 56.1 Stmt. ¶ 150.) Both Vaca and Guzman deny that the plaintiff raised any issue of discrimination during this meeting. (Vaca Dep. at 286-87; Guzman Dep. at 239-41.)

Four days later, on December 12, 2016, the plaintiff emailed her concerns about the write-ups to Brinkerhoff and another Clarins human resources manager, Frans Saint Louis. (Metis Decl. Ex. Q.) In the email, the plaintiff claimed that she was "not only being discriminated against because of [her] medical conditions, but also being set up to fail by being given unrealistic goals." (Id.) She explained that, out of the three employees on her sales team, she sold more of the two Prada products than anyone. (Id.) Specifically, she claimed that her sales accounted for at least 40 percent of what the entire team

sold for both products in October and November. (Id.) Both Vaca and Guzman later admitted that no member of Guzman's team ever met his or her monthly sales goal. (Vaca Dep. at 79-80; Guzman Dep. at 34.)

The plaintiff admits that she did not change her behavior after receiving the write-ups, but insists that she had no reason to change her behavior because it was never problematic. (Corona Decl. ¶¶ 7-8; Pl.'s 56.1 Stmt. ¶ 160.)

On December 18, 2016, Guzman emailed Brinkerhoff and copied Vaca to discuss the plaintiff. (Metis Decl. Ex. R.) Guzman requested guidance on managing the plaintiff because of the "sensitivity" of her "claims." (Id.) After speaking to both Guzman and the plaintiff, Brinkerhoff arranged a phone conference for December 21 or 22, 2016. (Id. Ex. S.) The plaintiff, Vaca, Guzman, and Brinkerhoff participated in this call. (Defs.' 56.1 Stmt. ¶ 164.) The defendants allege that Vaca discussed the plaintiff's poor sales numbers and bad attitude, including allegations that she continued to use her cell phone and ignore customers. (Id. ¶ 168.) The defendants also allege that Brinkerhoff asked the plaintiff how Clarins could further accommodate her disability. (Id. ¶ 169.) The plaintiff disputes this version of the call, and instead alleges that Guzman prompted the call in order to discuss an unrelated worker's compensation claim and that Brinkerhoff did not ask how Clarins

could better accommodate her needs. (Corona Decl. ¶ 28; Pl.'s
56.1 Stmt. ¶¶ 166, 169.) The plaintiff also alleges that she
repeated her complaints that her sales goals were impossible to
achieve, and that Vaca was setting her up to fail. (Corona Dep.
at 112-13.)

On December 22, 2016, Guzman emailed Vaca to report that,
earlier that day, Guzman saw the plaintiff talking with a
coworker and ignoring customers. (Metis Decl. Ex. N.) On January
13, 2017, Vaca emailed Brinkerhoff about terminating the
plaintiff's employment, but Brinkerhoff recommended waiting
until "the end of the week so we are close to the [thirty] day
mark from the last write up and conversation we had with her."
(Id. Ex. T; Defs.' 56.1 Stmt. ¶ 172.) Brinkerhoff directed Vaca
to the sections in both the first and second write-ups that
required at least thirty days before termination "may be
contemplated." (Metis Decl. Exs. O, P, T.) Guzman later
testified that Vaca was "driven by his eagerness" to terminate
the plaintiff's employment, and that illegitimate "personal"
reasons factored into his decision. (Guzman Dep. at 86.)

On January 18, 2017, Guzman emailed Brinkerhoff to report
that the plaintiff had not changed her "disrespectful" behavior.
(Metis Decl. Ex. U.) On January 24, 2017, Vaca again emailed
Brinkerhoff about terminating the plaintiff's employment. (Id.
Ex. V.) The email summarized the plaintiff's December sales

metrics. (Id.) In December, the plaintiff sold $12,599.36 of the
two Prada products, which Vaca noted was "less than half" of her
$65,200.00 monthly goal. (Id.) Vaca did not mention that in that
same month, the entire sales team sold $41,756.56 of the two
products. (Barnhorn Decl. Ex. G.)

Vaca also reported that the plaintiff was not on track to
meet her January sales goal. (Metis Decl. Ex. V.) At that time,
the plaintiff had sold $7,227.00 of her $18,100.00 monthly goal,
and there were only four days left for the plaintiff to close
the gap. (Id.) Vaca ended the email by noting continued problems
with the plaintiff's behavior, including that she had missed
three days of work in January due to illness and a doctor's
appointment. (Id.)

Vaca and Brinkerhoff decided together to terminate the
plaintiff's employment. (Defs.' 56.1 Stmt. ¶¶ 181–82.) Clarins
did so on January 26, 2017. (Barnhorn Decl. Ex. T.) The
plaintiff claims that the defendants' stated reason for
terminating her employment were her sales numbers. (Id.) That
same day, the plaintiff was diagnosed with parotid gland cancer.
(Corona Decl. ¶ 30; Corona Dep. at 177.)

### III.

The defendants move for summary judgment dismissing the
plaintiff's failure to accommodate claims under the ADA, NYSHRL,
and NYCHRL. The plaintiff does not oppose this portion of the

defendants' motion. (Pl.'s Opp'n. Br. 1 n.1.) Nor does she dispute that the defendants provided the accommodations that she requested. Therefore, the defendants' motion for summary judgment dismissing the plaintiff's failure to accommodate claims is **granted**.

## IV.

The defendants move for summary judgment dismissing the plaintiff's discrimination and retaliation claims under the ADA, NYSHRL, and NYCHRL.

## A.

As discussed at oral argument on September 10, 2019, the ADA does not provide for a right to recover against individual defendants in discrimination or retaliation claims. See Cerrato v. Durham, 941 F. Supp. 388, 395 (S.D.N.Y. 1996) (discrimination claims); Yaba v. Cadwalader, Wickersham & Taft, 931 F. Supp. 271, 274 (S.D.N.Y. 1996) (discrimination claims); Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010) (retaliation claims); Maus v. Wappingers Cent. Sch. Dist., 688 F. Supp. 2d 282, 302 n.10 (S.D.N.Y. 2010) (retaliation claims). The plaintiff does not dispute this. Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's ADA discrimination and retaliation claims against the individual defendant Vaca is **granted**.

**B.**

The plaintiff's remaining discrimination claims are governed by the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 n.8 (2d Cir. 2013) (NYCHRL); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) (NYSHRL and NYCHRL); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (ADA).

The McDonnell Douglas framework has three steps. The plaintiff must first establish a prima facie case of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993). All three statutes require the same four elements to establish a prima facie case. See Kinneary v. City of New York, 601 F.3d 151, 158 (2d Cir. 2010). The plaintiff must demonstrate: (1) that her employer is subject to the statute, (2) that she suffers from a disability or is perceived to suffer from such a disability within the meaning of the statute, (3) that she could perform the essential functions of her job with or without a reasonable accommodation, and (4) that she suffered an adverse employment action because of her disability. See, e.g., McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013); Brady v. Wal-Mart Stores, 531 F.3d 127, 134 (2d Cir. 2008). Under the ADA and the NYSHRL, "a plaintiff

alleging a claim of employment discrimination [must] prove that discrimination was the but-for cause of any adverse employment action." Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019); accord Dr. Rachel Wellner, M.D., v. Montefiore Medical Center, No. 17cv3479 (KPF), 2019 WL 4081898, at *8 (S.D.N.Y. Aug. 29, 2019) (applying the "but-for" analysis to both ADA and NYSHRL discrimination claims).

After the plaintiff establishes a prima facie case, the burden of production shifts to the defendants to offer a legitimate, nondiscriminatory reason for their adverse employment action. See St. Mary's, 509 U.S. at 506-07. If the defendants make such a showing, the plaintiff then has an opportunity to show that the proffered reason was not the true reason for the employment decision. See id. at 507-08. Ultimately, the "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see also Reeves, 530 U.S. at 143.

Discrimination claims under the NYCHRL are analyzed under a more lenient standard than under the ADA or the NYSHRL. See Mihalik, 715 F.3d at 109. Under the NYCHRL "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." Id. at 110 n.8. The defendant

may then present evidence that its actions were taken for legitimate, nondiscriminatory reasons, and the defendant is entitled to summary judgment if the record shows that "discrimination played no role in its actions." Id.

### C.

The first and third elements of the plaintiff's prima facie case of discrimination are not disputed. As to the first element, it is undisputed that Clarins is subject to the ADA, the NYSHRL, and the NYCHRL. As to the third element, the parties agree that the plaintiff's medical restrictions did not prevent her from performing the essential functions of her job as a sales associate.

The defendants argue that the plaintiff has failed to satisfy the second and fourth elements of a prima facie case. As to the second element, the defendants claim that the plaintiff has failed to allege a qualifying disability. The ADA and subsequent amendments define "disability" as a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A). "Major life activities" can include performance of manual tasks, walking, lifting, bending, and working. Id. § 12102(2)(A). The NYSHRL definition of "disability" "provid[es] relief to a broader range of impairments than does the ADA." Beason v. United Techs. Corp., 337 F.3d 271, 278 (2d Cir. 2003) (citations omitted). And

16

the NYCHRL goes even further to define "disability" as "any physical, medical, mental or psychological impairment, or a history of such impairment." N.Y.C. Admin. Code § 8-102.

The defendants do not dispute that the plaintiff was suffering from parotid gland cancer when she returned to work in September 2016. Moreover, the undisputed facts show that the plaintiff's cancer qualified as a disability under all three statutes. The defendants were aware of her medical condition, even if it was not yet diagnosed during her employment. The two doctors' notes made it clear that the plaintiff's medical condition impaired her ability to participate in some of the major life activities described in the ADA such as working, lifting, and bending. Having satisfied the narrower definition of a disability under the ADA, the plaintiff's disability thus satisfies the NYSHRL and NYCHRL requirements as well. Therefore, the plaintiff has satisfied the second element of her prima facie case.

As to the fourth element, the defendants claim that the plaintiff has failed to show that her employment was terminated because of her disability. Although the plaintiff has shown an adverse employment action -- the two write-ups and her employment termination -- she must also show that those actions "took place under circumstances giving rise to an inference of

discrimination." <u>Davis v. N.Y.C. Dep't of Educ.</u>, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam).

The plaintiff has raised issues of fact as to whether discrimination was the but-for cause of her employment termination. <u>See</u> <u>Bucalo v. Shelter Island Union Free Sch. Dist.</u>, 691 F.3d 119, 128 (2d Cir. 2012) (noting the plaintiff's burden at the prima facie stage is "minimal"). The plaintiff was disabled throughout the period of alleged discrimination beginning in September 2016. The plaintiff alleges that the defendants began to single her out from her coworkers only after she became disabled. She claims that she was individually punished for failing to meet new sales goals, even though nobody on her team met his or her own goals, and that the defendants used this as a basis for her employment termination. Because a reasonable jury could conclude that the defendant would not have terminated the plaintiff but for her disability, the plaintiff has established a prima facie case of discrimination.

Under the second step of <u>McDonnell Douglas</u>, the defendants have offered a nondiscriminatory reason for terminating the plaintiff's employment: a history of poor work performance. <u>See</u> <u>McBride v. BIC Consumer Prod. Mfg. Co.</u>, 583 F.3d 92, 98 (2d Cir. 2009). An employer is not required to lower its performance standards for disabled employees. <u>See</u> <u>Jacobson v. Capital One Fin. Corp.</u>, No. 16cv6169, 2018 WL 6817064, at *16 (S.D.N.Y. Dec.

12, 2018). The defendants argue that termination was justified because the plaintiff failed to improve her sales numbers after receiving the two write-ups on December 8, 2016.

Nevertheless, under the third step of McDonnell Douglas, there are issues of material fact as to whether the defendants' proffered reason for termination was merely a pretext for discrimination. In her sworn testimony, the plaintiff denied that her job performance was deficient in any way. Making "[c]redibility determinations" to assess these conflicting claims about the plaintiff's job performance "are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The defendants rely on a bevy of cases to argue that the Court should not substitute the plaintiff's subjective judgments about proper work performance for an employer's business judgments. However, the plaintiff in this case does not merely disagree with Vaca's assessment of her performance -- she disputes the truth of any underlying facts giving rise to that judgment. By contrast, the defendants' cases all contain situations where employees admitted to instances of poor work performance. Cf. Hill v. Bloomberg L.P., No. 14cv9809, 2016 WL 1665599, at *11 (S.D.N.Y. Apr. 20, 2016) (plaintiff's poor performance compared to his co-workers -- including at least one "embarrassing error" that he admitted to -- belied his claim that unrealistic expectations led to his inevitable

employment termination); <u>White v. Pacifica Found.</u>, 973 F. Supp.

2d 363, 382 (S.D.N.Y. 2013) (plaintiff did not deny evidence of

his poor performance and could not show that reasons for

termination, such as economic recession, were pretextual); <u>Silva</u>

<u>v. Peninsula Hotel</u>, 509 F. Supp. 2d 364, 385 (S.D.N.Y. 2007)

("Plaintiff does not dispute that he committed various

infractions . . . ."). Under the plaintiff's version of events,

a reasonable factfinder could determine that the defendants

relied on the plaintiff's sales performance as a pretext for

discrimination.

The June 2016 argument between the plaintiff and Guzman is

the only undisputed conflict that occurred before Vaca issued

the two write-ups six months later in December. However, the

plaintiff was never punished for the June incident, and she

testified that Guzman was to blame. Further, the June incident

involved the plaintiff's letter writing, rather than the

plaintiff's sales performance. These distinctions undermine the

defendants' argument that the plaintiff faced a history of

progressive discipline, while raising a question of fact about

whether the June incident legitimately influenced the

defendants' employment decisions.

Beyond the June 2016 dispute, both Guzman and Vaca

testified that Guzman regularly reported the plaintiff's poor

work behavior to Vaca before December 2016, including the

plaintiff's inattentiveness to the sales counter and her lack of initiative. However, this testimony about Guzman's reports is disputed by the plaintiff. Indeed, Guzman's report of the June 2016 incident is the sole email addressing the plaintiff's behavior that was sent before the plaintiff became disabled. There are no other reports before December 2016 on the record to corroborate a history of dissatisfaction with the plaintiff's work performance.

Moreover, it is unclear whether the defendants implemented the sales goals before October 2016. If the plaintiff first received sales goals in October 2016, then increased scrutiny of her sales performance only began after she returned to work with a disability in September 2016.

The plaintiff alleges that this increased post-disability scrutiny resulted in her being singled out for punishment. The plaintiff does not claim that the defendants ever had to lower their performance standards for her. Instead, she claims that no employee met the sales goals and that she was the most productive member of her team, but despite her productivity she was the only employee who was punished for failing to meet the monthly goals. Such a showing of disparate treatment between similarly situated employees is a "recognized method" of inferring discrimination. Ruiz v. Cty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010).

Finally, Clarins's method of terminating the plaintiff's employment also supports an inference of pretext. That a company ignores its own policies or procedures when it takes action against an employee can cast doubt on the good faith of the process. See Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997).

The plaintiff alleges that the defendants violated their own disciplinary policy in at least three ways. First, the plaintiff claims that Vaca issued the write-ups without having an informal discussion with her beforehand. Second, the plaintiff claims that issuing two write-ups on the same day was an aberration. Third, the plaintiff claims that Vaca attempted to fire her within thirty days of the December conference call, and that Vaca postponed the termination because Brinkerhoff explained that sufficient time had not elapsed as required by company policy. Indeed, the plaintiff's own supervisor, Guzman, testified that Vaca was motivated by "eagerness" and "personal" grievances against the plaintiff, which undermines the defendants' argument that they terminated the plaintiff for legitimate reasons alone. Such discrepancies in employer testimony regarding reasons for termination could raise an inference of pretext. See EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994). How much weight to accord these alleged policy violations is a question for a jury.

Given all of these factual disputes, a reasonable jury could find that the defendants' purported reason for the plaintiff's employment termination was a pretext for discrimination under the ADA and the NYSHRL.

Having satisfied the ADA and NYSHRL standards, the plaintiff's discrimination claim under the more liberal NYCHRL standard must also survive summary judgment. Therefore, the defendants' motion for summary judgment dismissing the plaintiff's discrimination claims is **denied**.

### D.

The plaintiff's remaining retaliation claims are analyzed under the same three-part McDonnell Douglas framework that governs her discrimination claims. See, e.g., Fox v. Costco Wholesale Corp., 918 F.3d 65, 71, 76 (2d Cir. 2019) (ADA and NYSHRL); Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (NYSHRL and NYCHRL).

To establish a prima facie case of retaliation, the plaintiff must show that (1) she participated in a protected activity, (2) the employer was aware of that activity, (3) the employer took an adverse employment action against the plaintiff, and (4) there was a "causal connection" between the protected activity and the adverse employment action. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

The plaintiff has satisfied all four elements of her prima facie case of retaliation. First, the plaintiff complained to the defendants about disability discrimination by email on December 12, 2016. She also alleges that she complained verbally about discrimination on both December 8 and December 21 or 22, 2016. These complaints constitute protected activities under the ADA, the NYSHRL, and the NYCHRL. "Employees engage in protected activity when they have a good faith, reasonable belief that they have made a complaint opposing an employment practice made unlawful by . . . the ADA." Salas v. New York City Dep't of Investigation, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018); see also Woldeselassie v. Am. Eagle Airlines/Am. Airlines, No. 12cv07703 LGS, 2015 WL 456679, at *8 (S.D.N.Y. Feb. 2, 2015), aff'd sub nom. Woldeselassie v. Am. Eagle Airlines, Inc., 647 F. App'x 21 (2d Cir. 2016) (discussing protected activities under ADA, NYSHRL, and NYCHRL). Second, as the recipients of those complaints, the defendants were aware of the plaintiff's protected activities. Third, the defendants' termination of the plaintiff was an adverse employment action. Fourth, the temporal proximity between the plaintiff's protected complaint and her termination is close enough to create an inference of retaliation. See Gorzynski, 596 F.3d at 110. While the Second Circuit Court of Appeals "has not drawn a bright line defining,

for the purposes of a prima facie case, the outer limits" of this temporal proximity, it has held that "five months is not too long to find the causal relationship." Id. The six-week lapse between the plaintiff's protected complaint on December 12, 2016 and her employment termination on January 26, 2017 falls well within this standard to create an inference of retaliation.

To prevail on her retaliation claim under the NYCHRL, the plaintiff only needs to show that the defendants were "motivated at least in part by an impermissible motive." Mereigh v. N.Y. & Presbyterian Hosp., No. 16cv5583, 2017 WL 5195236, at *6 (S.D.N.Y. Nov. 9, 2017). For retaliation claims under the ADA and the NYSHRL, there is a split of authority in the Second Circuit regarding whether the plaintiff must show that the protected activity was a "but-for" cause or merely a "motivating factor" for the adverse employment action. See Flieger v. E. Suffolk BOCES, 693 F. App'x 14, 18-19 (2d Cir. 2017) (describing the uncertainty in ADA retaliation claims); see Gordon v. City of New York, No. 14-CV-6115 (JPO), 2018 WL 4681615, at *16 n.10 (S.D.N.Y. Sept. 28, 2018) (noting unsettled law for NYSHRL retaliation claims). In any event, the plaintiff has created a dispute of material fact under the stricter "but-for" standard, and therefore this question need not be resolved on this motion. The plaintiff has therefore established a prima facie case of

retaliation under the first step of the McDonnell Douglas framework.

Under the second step of the McDonnell Douglas framework, the defendants again argue that they legitimately terminated the plaintiff's employment because of her poor work performance. The defendants also argue that a long history of discipline undermines any inference that the plaintiff's complaint motivated her employment termination. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (finding that gradual progressive discipline actions, beginning before the filing of an EEOC complaint, did not support an inference of retaliation).

However, under the third step of the McDonnell Douglas analysis, the defendants' motivation for termination is in dispute for substantially the same reasons discussed above with respect to the plaintiff's employment discrimination claims. Besides failing to meet the sales goals which she claims were discriminatory, the plaintiff denies that she ever performed poorly at work. Further, there is a disputed history of disciplinary action against the plaintiff prior to December 8, 2016. Cf. Neishlos v. City of New York, No. 00cv914, 2003 WL 22480043, at *9 (S.D.N.Y. Nov. 3, 2003) (holding that evaluations that recommended termination before the plaintiff

ever participated in a protected activity could rebut a temporal inference of retaliation).

Given the conflicting testimony, there are genuine issues of material fact concerning the defendants' motivations to terminate the plaintiff's employment. Accordingly, a reasonable jury could find that the defendants' purported reason for terminating the plaintiff's employment was a pretext for retaliation under the ADA and the NYSHRL.

Having satisfied the ADA and NYSHRL standards, the plaintiff's retaliation claim under the more liberal NYCHRL standard also survives summary judgment. Therefore, the defendants' motion for summary judgment dismissing the plaintiff's retaliation claims is **denied**.

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is **granted** as to the plaintiff's ADA, NYSHRL, and NYCHRL failure to accommodate claims. The defendants' motion for summary judgment is also **granted** as to the plaintiff's ADA claims against individual defendant Felipe Vaca. The defendants' motion for summary judgment is **denied** as to all remaining claims. The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the

arguments are either moot or without merit. The Clerk is
directed to close docket number 35.

**SO ORDERED.**


Dated:     **New York, New York**
           **September 12, 2019**

                                    _____
                                         John G. Koeltl
                                   United States District Judge